## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JUDY DOLLAR HULCHER,

      Petitioner,

v.                                         Case No. 8:20-cv-552-VMC-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

      Judy Dollar Hulcher, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1) and supporting memorandum (Doc. 2). Respondent filed a response opposing the petition. (Doc. 9.) Hulcher filed a reply. (Doc. 19.) Upon consideration, the petition is **DENIED**:

### Procedural History

      The State of Florida charged Hulcher with one count of grand theft and four counts of money laundering. (Doc. 12-2, Ex. 1, pp. 97-99.) A state court jury convicted Hulcher of grand theft but acquitted her of the money laundering counts. (*Id.*, pp. 126-27.) The state trial court sentenced Hulcher to 15 years in prison followed by 15 years of probation. (*Id.*, pp. 210-15.) The state appellate court *per curiam* affirmed the conviction and sentence. (Doc. 12-3, Ex. 5.) The state appellate court also *per curiam* affirmed the state court's denial of Hulcher's motion for postconviction relief, filed

under Florida Rule of Criminal Procedure 3.850. (Doc. 12-6, Ex. 17, pp. 742-59; Doc. 12-10, Ex. 17, pp. 1820-21; Doc. 12-13, Ex. 20.)

### Facts; Trial Testimony[1]

Hulcher worked at Payne Air Conditioning ("Payne"). As treasurer, she was authorized to sign checks from Payne's checking account. Payne underwent an annual review by a CPA named Terri Goleno. Frank Lansford, Payne's owner and president, read the review and noticed a significantly lower profit than expected. Lansford found over 200 company checks written by Hulcher. The majority were made payable to cash, and the remainder were made payable to Hulcher. Neither Lansford nor John Scott, a vice president at Payne, had authorized these checks. Lansford determined that Hulcher had taken over $800,000.00 from Payne without authorization. When Lansford confronted Hulcher, she said she had been borrowing money from Payne to play the lottery and produced a pad of paper containing a tally of the money. She told Lansford that she kept track of the money she took because she thought she was borrowing it and she intended to pay it back. Hulcher similarly told another employee, Debra Gill, that she cashed checks to buy lottery tickets, and that she was addicted to gambling. One time, Hulcher paid about $30.00 or $40.00 to Payne.

Payne hired another CPA, David Ramos, to conduct a forensic accounting report. Ramos determined that the total amount of unauthorized checks written by Hulcher was $780,158.00 for the period in question, which ranged from 2009 to 2013.

---

[1] This summary is based on the trial transcript and appellate briefs.

Donald Mardis, a special agent for the Florida Lottery, testified that Hulcher won $615,532.50 in the lottery from 2009 to 2013.

Hulcher testified in her defense. She testified that after January 2010, she could no longer pay for lottery tickets so she borrowed money from Payne. Hulcher stated that she cashed company checks and she sometimes took money out of cash deposits that were supposed to be deposited in the bank. Hulcher testified that she believed she was merely borrowing money and that she kept track of the money so that she could pay it back. Hulcher admitted to changing financial statements to hide the fact that she was taking money because she could not pay it back. Hulcher testified that she did not pay any of her lottery winnings back to Payne. Hulcher believed she was going to repay the money when she "hit the big one." (Doc. 12-3, Ex. 1d, p. 319.)

### Standards Of Review

**The AEDPA**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the denial of postconviction relief without discussion. This decision warrants deference under § 2254(d)(1) because "the

summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

**Ineffective Assistance Of Counsel**

Hulcher alleges ineffective assistance of trial counsel. Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

Hulcher must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Hulcher must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review "gives both the state court and the defense attorney the benefit of the doubt"). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## Exhaustion Of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## Discussion

### Ground One

Hulcher contends that trial counsel was ineffective for failing to argue to the jury that she was guilty of "a lesser included offense or lower charge" because Payne issued her an IRS Form 1099 ("1099") that set out the amount of money taken. (Doc. 1, p. 7). The state court denied this claim, adopting and incorporating the State's response into its order. The state court's order provides:

In Claim 1, Defendant argues that trial counsel was ineffective for failing to argue to the jury that the issuance of a 1099 supported a lesser charge. The State argues that the issue was raised in a pretrial motion to dismiss and is procedurally barred. Also, the State argues that Defendant was required to report the embezzled funds as income and that a 1099 was required to do so. The issuance of the tax document in no way excuses or legitimizes the money stolen.

(Doc. 12-10, Ex. 17, p. 1820.)

The State's response states:

Defendant[ ] . . . attacks Trial Counsel for not raising an argument to the trial jury that Payne Air accounted for the loss accruing from Defendant's theft by issuing her with an IRS Form 1099 showing the stolen money as income to her for tax purposes, thereby essentially ratifying the theft. Notably, Defendant does not show how providing Defendant with documentation of the money she took equates to permission to steal. Defendant claims that Trial Counsel rendered ineffective assistance by not presenting the argument to the trial jury. That claim is procedurally barred, and refuted by the law and the Record.

Defendant's conduct amounts to classic embezzlement at the common law. *See State v. Mischler*, 488 So.2d 523, 526 (Fla. 1986) ("Embezzlement is broadly defined as the fraudulent appropriation of another's property by a person to whom it has been entrusted or into whose hands it has lawfully come."). Embezzlement has been subsumed into [Florida's] omnibus grand theft statute, § 812.014 Fla. Stat. *See Crawford v. State*, 453 So.2d 1139, 1140 (Fla. 2d DCA 1984). And the proceeds of embezzlement constitute taxable income of the embezzler under the federal Internal Revenue Code. *See James v. United States*, 366 U.S. 213, 219-21 (1961). Defendant therefore was required to report her ill-gotten gains to the Internal Revenue Service as taxable income, and the form 1099 is required to do that. *See generally* U.S. Department of the Treasury, Internal Revenue Service, 2018 General Instructions for Certain Information Returns (Jul. 20, 2018). Providing that information certainly is not acquiescence to the theft of more than three quarters of a million dollars.

Defendant filed a motion to dismiss on this ground prior to trial. Therefore, any substantive issue relating to this subject was preserved for appeal and may not be raised on collateral attack in the guise of a claim of ineffective assistance; this claim therefore is procedurally barred. *See*

*Freeman v. State*, 761 So.2d 1055, 1067 (Fla. 2000). And the claim also is directly refuted by the record. At a hearing on Defendant's motion to dismiss, Ms. Goleno [the CPA who prepared Payne's annual review] testified that when one has money stolen from them, one still is liable for the taxes due on that income. There is a specific IRS form, number 4684, where a victim business can report the loss and receive a deduction from the taxes due. IRS rules require document matching. The tax deduction had to be accounted for, requiring an offset of income to the person who stole the money. The theft for all years is to be reported the year it is discovered. Frank Lunsford confirmed that the issuance of the 1099 form was intended to account for the income to Defendant since the loss was being taken as an expense, and that the money taken was a theft.

The theft statute provides that a theft happens when a person

> knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently: Deprive the other person of a right to the property or a benefit from the property [, or to a]ppropriate the property to his or her own use . . .

§ 812.014(1)(a)-(b), Fla. Stat. (2013). A consistent instruction was provided to the petit jury in this case. With the testimony of Mr. Lansford, Ms. Gillis, Mr. Scott, Ms. Goleno, Mr. Ramos, and Special Agent Mardis, and Defendant's own statements to Ms. Gillis, Mr. Lansford, and her trial testimony, no reasonable jury could fail to find that Defendant at least temporarily intended to appropriate Payne Air's money to her own use, to buy $800,000 worth of lottery tickets for Defendant's benefit, without the knowledge or consent of the corporate officers. Adding the 1099 form would have availed nothing, given that Ms. Goleno accounted for it in her cross-examination testimony,  . . . where she explained how the tax code allows for deductions of loss through theft.

Here, Defendant has failed to set forth evidence to overcome the strong presumption of effectiveness set out in *Strickland*. Trial counsel would have been on notice of the testimony of Ms. Goleno and of Mr. Lansford in the dismissal hearing, and he himself elicited facts relating to reporting of the tax deduction in cross examination. By trial, Trial Counsel would have known that there was a lawful reason for the 1099 form, and it is not deficient performance to not engage in a fruitless attack. As to prejudice, Defendant's motion is legally insufficient to show how introducing that information would have changed anything. H[er] claim

that introducing the 1099 form would have provided an avenue to a lesser-included crime is conclusory, and Defendant does not bother to explain what lesser included crime could have been contemplated. Defendant has in the past been given an opportunity to amend her motion, and it remains legally insufficient to show prejudice. Further amendment would serve no purpose, as the 1099 form would make no difference given that Ms. Goleno and Mr. Lansford both rendered trial testimony in every way consistent with their testimony at the dismissal hearing. Defendant's first claim should be denied without hearing as conclusively refuted by the Record.

(Doc. 12-10, Ex. 17, pp. 1832-36) (State's record citations omitted).

Respondent contends that Hulcher's ineffective assistance of trial counsel claim is unexhausted because she did not argue the merits of the claim on postconviction appeal. Rather, Respondent contends, Hulcher merely argued that the state postconviction court erred in not conducting an evidentiary hearing on the question of whether counsel could have "swayed jurors to mitigate the nature of the crime" by raising a defense based on the 1099. (Doc. 12-13, Ex. 18, pp. 8-10.)

To exhaust a claim, a petitioner must present the claim to every court that is part of the state's established appellate review process. *See Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (stating that in order to satisfy the exhaustion requirement, a petitioner must undertake "one complete round" of the state's review process). Upon reviewing Hulcher's appellate brief, which did address the merits of the ineffective assistance claim, the Court assumes that Hulcher exhausted the ineffective assistance claim.

Hulcher does not show that the state court's denial of her claim was unreasonable. As addressed by the state court, evidence at trial established that a

business can deduct theft as an expense for tax purposes in the year the theft is discovered. (Doc. 12-13, Ex. 1c, p. 225.) Hulcher does not show a reasonable probability of a different outcome had counsel addressed the 1099 that was issued to account for the theft. Further, because Hulcher does not explain how the subsequent issuance of the 1099 could have impacted her actions when she took the money, she does not show how the 1099 evidence supported a conviction for a lesser offense. Under these circumstances, Hulcher does not show that counsel was ineffective for failing to argue to the jury that the 1099 reduced Hulcher's criminal liability such that she should be found guilty of a lesser offense. Therefore, Hulcher fails to show that the state court unreasonably determined that counsel provided effective assistance.

As Hulcher does not show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination, she is not entitled to relief on Ground One.

**Ground Two**

Hulcher argues that trial counsel was ineffective in conceding her guilt to grand theft without consulting her. The state court denied this claim, again adopting and incorporating the State's response. The state court's order summarized the State's argument:

> In claim 2, Defendant argues that trial counsel was ineffective for conceding guilt as to count 1, grand theft. The State responds that counsel did not concede that the Defendant intended to steal money but that she intended to repay the amount. Also, the Court held a colloquy with the Defendant concerning trial counsel's strategy. Defendant acknowledged that counsel had discussed the strategy with her and that she had no objection.

(Doc. 12-10, Ex. 17, p. 1820.)

The State's response stated, in relevant part:

Trial Counsel conceded, *with Defendant's assent*, that Defendant actually took the money and used it to buy lottery tickets. Trial Counsel did *not* concede that Defendant *intended to steal*, and instead contended that Defendant intended all along to repay the money.

The trial judge queried Defendant, *under oath*, about Trial Counsel's strategy *before the jury came into the room*. The exchange between Defendant and the judge was:

> THE COURT:     All right. Ms. Hulcher, you heard everything counsel for the State, myself, and your attorney . . . were discussing right now regarding his—your attorney's trial strategy and potential admissions regarding some—at least a portion of the grand theft charge or something along those lines. Do you have any objection to your attorney's trial strategy at this point in time?
>
> THE DEFENDANT:     No.
>
> THE COURT:     All right. Have you had an opportunity to discuss trial strategy with him and he—if he's going to admit to something, have you had a chance to do that with him?
>
> THE DEFENDANT:     We have.
>
> THE COURT:     Okay. And you're comfortable with everything [counsel] just said as far as how he's going to conduct this trial?
>
> THE DEFENDANT:     I trust him to do what we have talked about.

Defendant now claims to have been confused about this questioning, and claims that she was not apprised of the strategy before trial. Defendant's claim is directly refuted by her contrary testimony under oath before the trial judge. Defendant plainly swore to the judge that she had discussed admissions with Trial Counsel and agreed with that strategy. Defendant

is bound by her under-oath assertions. . . . The record conclusively refutes the idea that Defendant did not assent to Trial Counsel's strategy or was confused regarding it.

As Defendant admits in her motion at ¶ 32, this issue is controlled by *Florida v. Nixon*, 543 U.S. 175, 182 (2004), where the Justices held that *Strickland* controls these questions. [FN]

> [FN] *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018), where the Justices held that *Nixon* does not permit a trial counsel to override her client's explicit objection to concession as a strategy, does not apply given Defendant's assent thereto. Additionally, the Florida Supreme Court has not . . . deemed *McCoy* retroactive to cases final on collateral review. . . .

Therefore, the questions are whether Trial Counsel rendered deficient performance in forming the strategy to concede partially, and whether that influenced the outcome. As noted *supra*, Defendant admitted to Mr. Lansford and Ms. Gillis that she embezzled money from Payne Air to purchase lottery tickets. As Mr. Ramos and Mr. Lansford discovered, Defendant wrote many checks to cash and to herself. There was documentary evidence in the form of the checks and ledger, and Defendant's admissions that she appropriated the money, without permission, to buy nearly a million dollars' worth of lottery tickets. For Defendant to take the stand and testify, she would have to be prepared to confront her admissions. Conceding to the reality that Defendant had openly admitted these things to two reliable witnesses changed nothing; the State's case was overwhelming without a concession from Trial Counsel that this happened, and the testimony of Mr. Lansford and Ms. Gillis would have carried the day regardless. All Trial Counsel did was advise Defendant to concede that which she could not reasonably deny. Defendant has failed to show either deficient performance or prejudice, and this claim should be denied.

(Doc. 12-10, Ex. 17, pp. 1836-39) (State's record citations omitted) (emphasis in State's response).

Hulcher does not show that the state court unreasonably denied her claim. As set out above, Hulcher agreed with counsel's strategy. *See, e.g.*, *Hammond v. Hall*, 586

F.3d 1289, 1327-28 (11th Cir. 2009) (collecting cases that stand for the proposition that a strategic decision by defense counsel does not amount to ineffective assistance under *Strickland* when the defendant agrees with the decision); *Acuna v. United States*, 494 F. App'x 961, 962-63 (11th Cir. 2012) ("This Court has stated that ineffective assistance does not exist under *Strickland* where the defendant ultimately concurred in his counsel's tactical decision or strategy. . . . Acuna essentially waived his right to contest his counsel's ineffectiveness by agreeing with that choice at trial."). Hulcher's sworn statements to the trial court are presumed to be correct. *Cf. Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) (stating in the context of a plea colloquy that a defendant's representations "constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity").

Moreover, as the state court indicated, any defense denying that Hulcher took the money would have lacked credibility in light of the overwhelming evidence that she did so. Thus, counsel reasonably chose to focus on Hulcher's mental state and her belief that she would repay the money. Under these circumstances, the state court did not unreasonably conclude that Hulcher failed to show either prong of *Strickland*. Because Hulcher does not show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination, she is not entitled to relief on Ground Two.

**Ground Three**

Hulcher argues that trial counsel was ineffective in waiving a pre-sentence investigation ("PSI") before sentencing. She argues that she was entitled to a PSI

14

because she was a first-time offender. *See* Fla. R. Crim. P. 3.710(a) ("No sentence or sentences other than probation or the statutorily required mandatory minimum may be imposed on any defendant found guilty of a first felony offense . . . until after . . . investigation [by the Department of Corrections] has first been made and the recommendations of the Department of Corrections received and considered by the sentencing judge.").

Respondent argues that Hulcher did not exhaust her claim on postconviction appeal. Respondent contends that Hulcher only argued that the state postconviction court erred in not conducting an evidentiary hearing. After reviewing Hulcher's appellate brief, which discussed the merits of the underlying claim, the Court will assume that Hulcher's argument was sufficient to exhaust the ineffective assistance of trial counsel claim.

The state court denied Hulcher's claim. It addressed the State's response, which it adopted and incorporated into the denial order:

> In claim 3, Defendant argues that trial counsel was ineffective for failing to request a pre-sentence investigation. The State argues that the claim is speculative and conclusory. The Court was able to review letters of support prior to sentencing and heard testimony regarding the Defendant's gambling addiction. Additionally, the Court did not seem inclined to impose a downward departure sentence.

(Doc. 12-10, Ex. 7, p. 1820.)

The State's response provides:

> The key portions of this allegation are that the PSI would have supported Defendant's gambling addiction, that an "independent evaluation," presumably by a probation officer, would have shown Defendant qualified for a prison term of no more than 21 months, and that support

letters existed from other persons. Defendant falsely claims that sentencing judge did not have the benefit of either of these things . . . Defendant also claims that Trial Counsel rendered ineffective assistance by not arguing for a downward departure; the Record refutes any showing of prejudice as to this because a departure is discretionary and the presiding judge was not inclined to exercise his discretion.

## 1. "Independent evaluation."

As to Defendant's claim relating to an "independent evaluation," that claim is both speculative and conclusory. Defendant presents no facts or analysis of any kind to back that up. . . .

## 2. A PSI would change nothing.

As to Defendant's claim relating to her so-called "addiction," a PSI would change nothing. As noted *supra*, Defendant gave extensive testimony relating to that. Further, at sentencing Trial Counsel produced Tracy Hartig, Psy.D., to testify. Dr. Hartig specifically evaluated Defendant for the sentencing, and diagnosed Defendant with gambling disorder, major depressive disorder, anxiety disorder, and dependent personality features. She testified at length about gambling disorder and its impact on Defendant. On cross-examination, Dr. Hartig emphasized her recommendation for outpatient treatment and specialized treatment with respect to gambling. On redirect, Dr. Hartig confirmed that Defendant's ability to conform her actions to the law was impaired. This information was before the trial court judge, and Defendant can show neither deficient performance of Trial Counsel or prejudice to Defendant for not duplicating effort with a PSI.

## 3. Departure sentence/letters

Defendant's position is that Trial Counsel should have moved for a departure sentence, and used the letters written by Defendant's friends to support that. The Record shows that strategy would have failed.

Trial Counsel's strategy was to obtain something close to the floor term of 21 specified in the Criminal Punishment Code. This caught the prosecutor, who was anticipating arguing against departure, off-guard. Trial Counsel focused on Defendant's remorse. He emphasized her mental health issues. He emphasized that Defendant did not spend the money she won on things for herself but spent it on more lottery tickets instead, pointing to her addiction. He spoke of Defendant taking responsibility for her crime, and criticized the State for both feeding her

addiction[2] and prosecuting her for the result. He asked the presiding judge to sentence [her] to 30 months. The State sought 20 years.

[ ] Mr. Lansford testified [at the sentencing hearing] that Defendant had nearly destroyed his business. Payne Air was forced to lay off staff and was nearly driven into bankruptcy. It was during the national financial crisis that Defendant stole, and Payne employees were being laid off, losing their cars, losing their homes. Defendant cared not about that. She only cared about playing the lottery with someone else's money; when Mr. Lansford confronted her, her response was that no money was left once she paid the taxes and bought things for herself. She made no efforts to repay any of the stolen money, despite having won over half a million dollars. She tried to avoid financial liability for her crimes before her arrest by cashing out her retirement plan and quitclaiming her home to her husband. She "nearly crippled" a company in business in our community for 80 years, and harmed 90 families who depended on Payne Air for their livelihoods. This is powerful aggravation. Defendant's gambling addiction does not excuse her conduct, and Trial Counsel had to argue for a realistic option—Defendant was not going to avoid prison for what she'd done.

The letters Defendant refers to would change nothing. They were already in the Court's record, and available to the presiding judge. . .

At sentencing the judge had access to [a disposition] memorandum and the file. . . . Here, the trial judge was most moved by the nearly 100 people who suffered for Defendant's selfishness. The judge recognized Defendant's personal issues. He thought that Trial Counsel had done a "powerful, wonderful" job of bringing that out. That was outweighed by Defendant's position of fiduciary responsibility. Only getting caught stopped her. Any financial gain she realized went to herself and not to her victims.

Importantly, the judge explicitly held that the CPC floor term of 21 months was wholly unreasonable. . . . He looked at the facts and circumstances in totality, and felt that the State's request for a 20 year prison term was equally unreasonable. He also gelt that the 30 months Trial Counsel sought was patently unreasonable. The judge relied on the company nearly being bankrupted, almost 100 employees greatly

---

[2] The State appears to refer to counsel's argument that the State of Florida's expansion and promotion of the Florida Lottery affected Hulcher's gambling addiction. (Doc. 12-10, Ex. 17, pp. 1711-14.)

suffering, and Defendant's failure to return any of the money over many years' time. The judge especially was disturbed that this took place over four years. Fifteen years in prison, followed by probation, was reasonable.

Here, the Record is replete with evidence that the trial judge was not disposed to exercise his discretion and depart below the CPC floor score. An attempt by Trial Counsel to argue for downward departure, based on the letters attached to his disposition memorandum, would have been utterly fruitless; the trial judge thought that even the 21 month CPC floor was too lenient under the circumstances. Even if it can be said that Trial Counsel rendered deficient performance for not making the attempt, Defendant cannot show that the trial judge would have changed his mind with that information brought to the fore. That information does absolutely nothing to mitigate the enormous damage that Defendant, a responsible corporate officer, did to an 80-year old company and nearly 100 of its employees and their families, over four years' time.

(Doc. 12-10, Ex. 17, pp. 1839-46) (State's record citations omitted).

Hulcher does not show that the state court's decision was unreasonable. Initially, as the state court noted, Hulcher's assertion that any additional information or argument by counsel would have resulted in a different sentence is speculative. The state trial court held a sentencing hearing and considered the evidence presented by both the State and the defense. The state trial court took into account evidence about Hulcher's gambling addiction and her lack of a criminal record, but also considered the damage she caused to Payne and its employees, as well as her failure to repay money even when she obtained lottery winnings. (Doc. 12-10, Ex. 17, pp. 1715-18.) Hulcher does not clearly explain what new or different information would have been included in an independent evaluation or a PSI that would have changed the outcome.

In addition, the state trial court was aware of the 21-month minimum calculated on the sentencing scoresheet, and determined that neither the prison sentence sought

18

by the defense (30 months) nor the prison sentence sought by the State (20 years) was appropriate given the facts and circumstances, including those brought out by Hulcher. (*Id.*, pp. 1718-21.) In light of the evidence that the state court heard and considered, any allegation that a lesser sentence would have been imposed had a PSI been conducted or had counsel argued for a downward departure is speculative. Speculation is not enough to demonstrate ineffective assistance. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim). The state court did not unreasonably conclude that counsel afforded Hulcher effective representation at sentencing, or that Hulcher failed to show prejudice as a result of counsel's performance.

Hulcher does not show that the state court's ruling involved an unreasonable determination of *Strickland* or was based on an unreasonable factual determination. She is not entitled to relief on Ground Three.

**Ground Four**

Hulcher contends that trial counsel was ineffective in failing to move for a judgment of acquittal ("JOA") on the basis that the State failed to prove "felonious intent." (Doc. 1, p. 13). The state court denied Hulcher's ineffective assistance of counsel claim. It summarized the State's response, which it adopted and incorporated into the order of denial:

> In claim 4, Defendant argues that trial counsel was ineffective for failing to argue lack of felonious intent in a Motion for Judgment of Acquittal. The State argues that even a temporary taking of another's property

19

constitutes theft. Also, the Defendant made no attempt to repay the amount stolen. Defendant has failed to establish deficient performance or prejudice.

(Doc. 12-10, Ex. 7 pp. 1820-21.)

The State's response provides:

Simply put, as noted *supra*, the crime of theft is complete when a person

> knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, *either temporarily or permanently*: Deprive the other person of a right to the property or a benefit from the property [, or to a]ppropriate the property to his or her own use . . .

§ 812.014(1)(a)-(b), Fla. Stat. (2013) (emphasis added). . . .

Defendant essentially claims that her failing to return the money is not evidence of felonious intent, and that her intent was to return the money, so there could be no intent to steal. That ignores the statutory proscription against taking property and converting it to one's own use, even *temporarily*. A temporary theft is still a theft. In *State v. Dunmann*, 427 So.2d 166, 166-69 (Fla. 1983), the high court considered a claim that in the charging information for a theft the State had not alleged an intent to deprive the victim of her property permanently. The high court held that not to be required under [Florida's] omnibus theft statute; rather, the specific intent to deprive *at all* is what the Legislature intended to criminalize. *See id.* at 169. And in *O'Brien v. State*, 327 So.3d 237, 238-39 (Fla. 1st DCA 1976), decided under the law pre-dating the omnibus theft statute, an embezzler who, when his theft was discovered four months after the fact, signed an agreement to repay embezzled funds and then did not, was held to have shown intent to commit theft by his failure to follow through with the repayment agreement. Even under the law predating the omnibus theft statute, Defendant's position is a non-starter; unlike Mr. O'Brien, she never made any effort whatsoever to repay what she stole, though that now is not required to show intent.

To obtain a judgment of acquittal, Defendant would have to show that if one takes every fact and every inference from those facts in the light most favorable to the State, a rational trier of fact could not find the existence of the intent element of grand theft. *See*, *e.g. Pagan v. State*, 830 So.2d 792, 802 (Fla. 2002) (discussing the standard for a judgment of acquittal).

> Here, the evidence . . . makes plain that Defendant intended to, at least
> temporarily, deprive Payne Air of its money, appropriating it to her own
> purpose of splurging on $800,000 worth of lottery tickets. Defendant
> herself admitted it to two different people. Whether Defendant had a
> subjective intent to repay the money or not is of no moment; even were
> that still the law, *O'Brien* shows her position would fail. No rational judge
> would grant a directed verdict on this evidence.

(Doc. 12-10, Ex. 17, pp. 1847-49) (State's record citations omitted) (emphasis in State's

response).

Hulcher does not show entitlement to relief. In ruling on a motion for JOA, a

state trial court must consider the evidence in the light most favorable to the State. *See*

*Boyd v. State*, 910 So.2d 167, 180 (Fla. 2005) ("A trial court should not grant a motion

for judgment of acquittal 'unless the evidence is such that no view which the jury may

lawfully take of it favorable to the opposite party can be sustained under the law.'"

(quoting *Lynch v. State*, 293 So.2d 44, 45 (Fla. 1974))). The underlying question of

whether the State presented evidence of felonious intent sufficient to survive a motion

for JOA involves an application of Florida's JOA standard, as well as Florida law

interpreting the elements of grand theft. And as the state court pointed out, the State

presented significant evidence that Hulcher took money from Payne. The state court

determined that the evidence of guilt was sufficient under state law to defeat a motion

for judgment of acquittal on the grand theft charge.

This Court must defer to the state court's application of state law. *Pinkney v.*

*Secretary, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of

ineffective assistance—even when based on the failure of counsel to raise a state law

claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's

construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [petitioner's counsel] objected to the introduction of [petitioner's] statements based on [state law] – the objection would have been overruled. . . . Therefore, [petitioner's counsel] was not ineffective for failing to make that objection."). Hulcher does not show that the state court unreasonably determined that trial counsel was not ineffective in his presentation of the JOA motion.

Hulcher has not established that the state court unreasonably applied *Strickland* or based its decision on an unreasonable factual determination. She is not entitled to relief on Ground Four.

**Ground Five**

Hulcher argues that her sentence was vindictive "based on her position of authority or status as a Corporate Officer, not taking serious consideration of her gambling addiction, prejudice that she had no restitution to offer, and exercised her right to a jury trial." (Doc. 1, p. 15). Hulcher claims that her sentence was "at the very top of the applicable guidelines; as a result, there is a presumption of vindictiveness as she had never been convicted of any previous crime." (*Id.*) Citing *North Carolina v. Pearce*, 395 U.S. 711 (1969), Hulcher appears to allege a violation of her federal right to due process.

The state court denied Hulcher's claim, summarizing the State's response:

> In Claim 5, Defendant argues that her sentence was vindictive. The State argues that the claim is procedurally barred as the claim should have been raised on direct appeal. The State goes on to point out that the Defendant was facing a thirty year sentence and that it rejected the State's request for a twenty year sentence. The sentencing transcript refutes the Defendant's claim and shows that the Trial Court considered all facts and circumstances prior to imposing Defendant's sentence.

(Doc. 12-10, Ex. 17, p. 1821.)

> The State's response, adopted and incorporated by the state court, provides:

> First, Defendant attacks the sentence of the Court, not the performance of Trial Counsel. Claims of trial court error are to be raised on direct appeal, and are not cognizable in a motion for postconviction relief. *See Bruno v. State*, 807 So.2d 55, 63 (Fla. 2001); *see also Sampson v. State*, 845 So.2d 271, 272 (Fla. 2d DCA 2003). Defendant's claim is procedurally barred.

> Second, the Record refutes a claim that the trial judge's sentence was in any way vindictive. As noted *supra* . . . the trial judge explicitly rejected the State's request for a *20* year prison term as inappropriate. Defendant faced a potential prison sentence of *30* years. *See* §§ 775.082(3)(b); 812.014(2)(a) Fla. Stat. (2013). The trial judge carefully weighed all the facts and all the circumstances in determining the appropriate sentence . . . . The trial judge considered Defendant's lack of criminal history, and her gambling addiction, and determined that the severity of her conduct outweighed these factors.

> Defendant wrongly relies upon *North Carolina v. Pearce*, 395 U.S. 711 (1969), for the idea that a presumption of vindictiveness arises when a defendant is harshly sentenced despite the lack of a criminal record. But that is not the law. *Pearce* is a postconviction case, arising only in the case of a remanded sentence where a defendant receives a harsher sentence on resentencing *See Wemett v. State*, 567 So.2d 882, 884-85. Each of the cases Defendant cites in support of her claim to vindictiveness are cases in postconviction, remanded for resentencing. This is not such a case.

(Doc. 12-10, Ex. 17, pp. 1850-51) (State's record citations omitted) (emphasis in State's response)

Initially, Respondent contends that the federal claim is procedurally barred because the state court denied it on an independent and adequate state procedural ground. A petitioner's failure to comply with state procedural rules governing the proper presentation of a claim generally bars federal review of that claim in a subsequent federal habeas proceeding. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) ("This Court will not review a question of federal law decided by a state court if the decision . . . rests on a state law ground that is independent of the federal question and adequate to support the judgment."). The state court's order, in which it "agreed with" and adopted and incorporated the State's arguments on both the procedural issues and the merits, did not clearly state whether its ruling relied on a procedural bar, and whether the merits review was therefore merely in the alternative. Assuming that the state court's decision relied on the merits, Hulcher does not show that the state court's ruling was unreasonable.

Due process prohibits a court from increasing a defendant's sentence because the defendant exercised a constitutional right. *See Pearce*, 395 U.S. at 725. *Pearce* established a presumption of judicial vindictiveness that arises "whenever a judge imposes a more severe sentence upon a defendant after a new trial" unless the reasons for the increased sentence are apparent on the record. *Id.* at 726. The presumption only applies in circumstances showing a "reasonable likelihood" of vindictiveness by the sentencing court. *See Alabama v. Smith*, 490 U.S. 794, 799 (1989).

Here, Hulcher does not establish any constitutional violation. Initially, as the state court noted, unlike *Pearce*, Hulcher's case did not involve resentencing.

Furthermore, there is no indication from the record of the sentencing hearing that the court imposed the sentence because of Hulcher's exercise of any constitutional right. As addressed in Ground Three, the trial court considered the arguments and evidence presented by Hulcher, including evidence of her gambling addiction. Hulcher's claim that the trial court did not "serious[ly]" consider this information is speculative and is unsupported by the sentencing hearing record. There is no indication that the sentence was "vindictive" so as to violate due process based on Hulcher's status as an officer of the company and the fact that she did not repay the money. Hulcher does not show that the trial court improperly considered these factors in imposing her sentence. Nor does Hulcher support her conclusory allegation that the trial court's sentence was vindictively imposed because she chose to go to trial. Hulcher fails to establish that the state trial court imposed a vindictive sentence in violation of her federal constitutional rights.

Hulcher does not show that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. She is not entitled to relief on Ground Five.

It is therefore **ORDERED** that Hulcher's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Hulcher and to **CLOSE** this case.

**Certificate Of Appealability
And Leave To Appeal *In Forma Pauperis* Denied**

It is further **ORDERED** that Hulcher is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute

entitlement to appeal a district court's denial of her petition. 28 U.S.C. § 2253(c)(1). Rather, a COA must first issue. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To obtain a certificate of appealability, Hulcher must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues she seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Hulcher has not made the requisite showing. Finally, because Hulcher is not entitled to a COA, she is not entitled to appeal *in forma pauperis*.

    **ORDERED** in Tampa, Florida, on January 23, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE